# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT M. MCFARLAND, | CASE NO. 3:14-cv-01236-MEM-GBC |
| Plaintiff, | (JUDGE MANNION) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND |
| Defendant. | REMAND FOR FURTHER PROCEEDINGS |
| | Docs. 1, 9, 10, 11, 12 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Robert M. McFarland for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In this case, an examining state psychologist opined that Plaintiff had work-preclusive mental limitations. A treating psychologist also opined that Plaintiff had work-preclusive mental limitations. A reviewing psychologist opined that Plaintiff could meet the basic mental demands of competitive work. The ALJ credited the reviewing medical opinion over the examining medical opinion.

However, the reviewing physician reviewed only two of Plaintiff's progress notes from Muhlenberg Behavioral Health, in February and March of 2011. Only one of these notes pertains to the relevant period, which began in March of 2011. These notes indicated that his global assessment of functioning ("GAF") was sixty and his bipolar disorder was stable. In August of 2011, Muhlenberg Behavioral Health erroneously reported that Plaintiff had not been seen there since March of 2011. The reviewing physician relied on this alleged lack of treatment after March of 2011. The reviewing physician also failed to acknowledge an opinion from Plaintiff's neurologist that he was disabled for twelve months due to the complexity of managing his headaches and psychiatric symptoms.

Subsequently, Muhlenberg Behavioral Health submitted records showing that Plaintiff continued treatment after March of 2011 through at least June of 2012. Plaintiff reported significant subjective complaints while objective examination indicated hypervigilance, psychomotor agitation, abnormal gait, tremors, restricted affect, dysphoric and irritable mood, and perseveration in his quality of thought. His GAF scores were only 30, 40, 45, or 50 through 2011.

The Regulations establish a preference for treating and examining over non-examining medical opinions. The non-examining opinion relied on an erroneous treatment record. Thus, the non-examining opinion fails to provide substantial evidence to reject the consistent examining and treating opinions that Plaintiff

suffered disabling mental impairments. As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On June 6, 2011, Plaintiff filed an application for DIB under the Act. (Tr. 117-18). On October 3, 2011, the Bureau of Disability Determination denied this application, (Tr. 101-10) and Plaintiff filed a request for a hearing on November 30, 2011.   (Tr. 114). On August 8, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 47-86).   On October 24, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-28). On December 18, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 9-10), which the Appeals denied on May 8, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On June 26, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On September 3, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On October 16, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 11). On November 5, 2014, the case was referred to the undersigned Magistrate Judge. On November 18, 2014, Defendant

filed a brief in response ("Def. Brief"). (Doc. 12). Plaintiff did not file a reply, and the matter is now ripe for review.

### III. Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV. Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also

determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on October 14, 1969 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 24). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a cable technician and a floor installer. (Tr. 24).

Plaintiff stopped working when he was hospitalized twice in January of 2011 for confusion, paresthesia, headaches, numbness, and tingling. (Tr. 92). Discharge diagnoses included "severe" anxiety and depression. (Tr. 223-308). Plaintiff filed a previous application for benefits under the Act, which was denied on March 8,

2011. (Tr. 88). Thus, the relevant period for the present application begins on March 9, 2011.[1]

The ALJ relied on an opinion from Dr. Anthony Galdieri, Ph.D., a state agency psychologist, authored on October 3, 2011, who reviewed a small portion of the relevant evidence. (Tr. 88-93).

On February 17, 2011, Plaintiff had a psychiatric evaluation at Muhlenberg Behavioral Health with Cynthia Himpler, CRNP, MS. (Tr. 349). He had treated at a partial hospitalization program after his discharge from Muhlenberg Hospital from January 17, 2011 to February 9, 2011. (Tr. 349). During the partial hospitalization, he was diagnosed with bipolar disorder and prescribed Depakote. (Tr. 349). He indicated that he had been diagnosed with bipolar disorder in the past and had "long standing problems with anger, explosiveness, difficulty managing people, responses, traffic, etc." (Tr. 349). Plaintiff was assessed a GAF of 60, instructed to continue therapy with Pat Gordy, LCSW, and his Depakote was increased. (Tr. 350).

---

[1] Plaintiff argues that his prior application should be reopened. (Pl. Brief). Although that claim may have merit, this Court does not have jurisdiction to rule on that claim. *See Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999) ("It is well settled that federal courts lack jurisdiction under § 205 to review the Commissioner's discretionary decision to decline to reopen a prior application or to deny a subsequent application on res judicata grounds.") (internal citations omitted).

On March 15, 2011, Plaintiff followed-up with Ms. Himpler at Muhlenberg Behavioral Health. (Tr. 347). Plaintiff reported that his "wife still says [he] go[es] off." (Tr. 347). He reported that he was "tolerating" an increased dose of Depakote and his "headaches [were] gone." (Tr. 347). His mood was "less anxious, thoughts more focused. No problems with appetite or sleep. Energy is fair. No psychosis or [suicidal ideation/homicidal ideation]. Remain[ed] out of work." (Tr. 347). Plaintiff had laboratory results reviewed, and his Depakote level was low. (Tr. 347). CRNP Himpler observed that Plaintiff's "bipolar disorder appears more stable. He struggles with anger relative to [intermittent explosive disorder]-would benefit by therapy directed at helping him cope with this long term problem. Asked him to consider bringing his wife to a therapy appointment." (Tr. 347). Plaintiff's Depakote was increased again, he was instructed to undergo lab work to confirm he was taking Depakote as prescribed, and he was instructed to follow-up in six weeks. (Tr. 347). His diagnoses were bipolar disorder, intermittent explosive disorder, and personality disorder not otherwise specified. (Tr. 347). She did not note his GAF score. (Tr. 347).

Dr. Galdieri reviewed only these two treatment notes from Muhlenberg Behavioral Health and relied on an erroneous representation from Muhlenberg Behavioral Health that Plaintiff had not continued treatment after March 16, 2011. (Tr. 89, 91).

On May 3, 2011, Plaintiff followed-up with CRNP Himpler at Muhlenberg Behavioral Health. (Tr. 501). Plaintiff stated "I'm not doing good ... in all ways." (Tr. 501). He "[c]ontinue[d] with rage type issues; quick reactions... stuttering, lapses of memory and concentration." (Tr. 501). His "mood [was] calm in office." He reported that his appetite was intact, he required Ambien to sleep, and had no psychosis, suicidal ideation, or homicidal ideation. (Tr. 501). He was assessed to have bipolar II disorder, alcoholism, cocaine dependence in remission, intermittent explosive disorder, personality disorder, and an unspecified persistent mental disorder. (Tr. 502). He was "reminded" to get his Depakote level checked and instructed to follow-up with his neurologist and Pat Gordy, LCSW for therapy. (Tr. 502). CRNP Himpler indicated "due to complex medical issues/migraines, etc., will be referred to psychiatrist for further care." (Tr. 502). Dr. Galdieri did not review this record. (Tr. 89, 91).

On May 6, 2011, Plaintiff contacted neurologists at Lehigh Neurology by phone. (Tr. 362). He reported he had "another migraine on Monday night and this one was really bad...speech was slurred and his face was numb, his mind races and he has flight of ideas, he is off balance and stumbling around and has fallen several times." (Tr. 362). Plaintiff reported feeling more "shaky" since starting Depakote, questioned if Depakote was contributing to his dizziness, and "keeps telling [his primary care provider] he can't stay on that med[ication]." (Tr. 362). Plaintiff

reported being unable to work "due to recurring psych[iatric] issues…unable to concentrate, gets dizzy, and has migraines with stress." (Tr. 362).

On May 27, 2011, Plaintiff presented to Dr. Glenn Mackin, M.D. at Lehigh Neurology. (Tr. 361, 403). Plaintiff was accompanied by his wife and granddaughter. (Tr. 361). He reported that he continued to get "off balance" and his wife reported that his speech was "affected and this is intermittent." (Tr. 362). Plaintiff reported that "almost daily" he was unable to "get words out" and had a "spell" two weeks earlier "where he was slurring his words and stumbling and falling" that lasted four days. (Tr. 362). He also indicated that he had a migraine and his face went numb. (Tr. 362). Plaintiff reported that he drank a six-pack of alcohol per week, his wife reported that he drank less. (Tr. 362). He indicated that his headache improved with Depakote. (Tr. 362). Plaintiff clarified that his headaches still occurred twice a week and he "takes the Cambia." (Tr. 362).

On examination, Plaintiff had an "occasional stutter without alteration of consciousness," decreased reflexes in both ankles and a mild postural tremor. (Tr. 365). Dr. Mackin noted his postural tremor "fits with [Depakote] and may or may not relate to a high level." (Tr. 365). He noted that reducing Plaintiff's psychiatric medications may resolve his tremor, but could reduce the mood stabilizing benefits. (Tr. 365). He concluded that "this is a fairly complicated in multidisciplinary medication adjustment, and patient is having these episodes

frequently enough that he clearly cannot work so [he] did fill out a 12 months temporary disability form starting in January 2011 and expected to cease by January 2012." (Tr. 365). He "did not think [Plaintiff] was having TIAs but nonetheless [thought] it prudent for [him] to continue with a baby aspirin." (Tr. 366). Subsequent testing indicated that Plaintiff's Depakote level was "mid therapeutic...not excessively high, which would have been the most straightforward" way to resolve Plaintiff's tremor without losing mood stabilizing benefits. (Tr. 367). Dr. Galdieri reviewed this treatment record, but did not acknowledge the opinion that Plaintiff was disabled for twelve months. (Tr. 89, 91, 94).

On June 2, 2011, Plaintiff presented to Patricia Gordy, LCSW at Muhlenberg Behavioral Health. (Tr. 499). She noted that Plaintiff "brought his wife with him and said that he needed her help to make it through the session." (Tr. 499). Ms. Gordy noted "the distress he has been enduring with anger outbursts distractability, loss of his job, and serious problems" with his children. (Tr. 499). Plaintiff indicated he also wanted help at the next session for sleep disturbance. (Tr. 499). Dr. Galdieri did not review this record. (Tr. 89, 91).

On June 7, 2011, Plaintiff presented to Dr. Christi Weston, M.D., at Muhlenberg Behavioral Health. (Tr. 495). She noted that:

> Patient is presenting today for follow up. He was previously seen by
> Cindy Himpler after he was discharged from partial hospital program

earlier this year. Patient carries a diagnosis of bipolar disorder. He has been treated with Depakote 2000 mg daily...reports that he has had significant side effects since starting Depakote. His wife comes today and confirms that he did not have any of these symptoms prior to starting Depakote, The patient reports tremulousness, dizziness, ataxia, frequent falls, slurring of his speech, and numbness in his face. Apparently, the patient's headaches have somewhat improved since starting Depakote, although they persist despite him being on a high dose... Patient reports recent symptoms of low mood, mostly related to his side effects. He also reports extreme irritability. Patients wife confirms that the patient is very irritable and has explosive bouts of anger. His anger has gotten him into legal problems in the past. Both he and his wife are very concerned about this symptom.

(Tr. 495). On examination, Plaintiff exhibited hypervigilance, psychomotor agitation, abnormal gait, and tremors. (Tr. 495). His affect was restricted and his mood was dysphoric and irritable. (Tr. 495). His quality of thought indicated perseveration. (Tr. 495). His mental status examination was otherwise normal. (Tr. 495). Plaintiff was assessed to have a GAF of 30, with the highest GAF in the past year of 50. (Tr. 497). Plaintiff's Depakote was discontinued and he was started on Tegretol due to the side effects from Depakote. (Tr. 497). Plaintiff was instructed that he would likely need a new medication for his headaches and to abstain from drugs and alcohol. (Tr. 497). His Ambien was continued. (Tr. 497). Dr. Galdieri did not review this record. (Tr. 89, 91).

On June 29, 2011, Plaintiff followed-up with Ms. Gordy. (Tr. 493). She noted that Plaintiff was "still struggling with distractibility and symptoms of bipolar disorder." (Tr. 493). He reported that "he is trying to adapt to medication

changes with Dr. Weston, and he has had only two intense outbursts since our last session. At times he can feel 'flippy' and he also brought up the experience of restless leg syndrome, which upsets his wife." (Tr. 493). Ms. Gordy encouraged him to focus on doing things that relax him, such as fishing. (Tr. 493). Plaintiff's compliance with therapy was described as "good." (Tr. 493). Dr. Galdieri did not review this record. (Tr. 89, 91).

On July 10, 2011, Plaintiff's primary care physician, Dr. Victor Manzella, completed a medical opinion. (Tr. 374-75). He opined that Plaintiff had no limitation in lifting, carrying, standing, walking, sitting, pushing, pulling, postural activities, other physical functions, or environmental exposure. (Tr. 374-75). He explained that Plaintiff had "no significant medical findings-he suffers from severe anxiety, depression [and] bipolar disorder for which he sees a psychiatrist and neurologist." (Tr. 374).

On July 19, 2011, Plaintiff followed-up with Dr. Weston. (Tr. 490). She noted that "[h]e continues to have irritability and anger. Patient has not been sleeping well. His wife reports that he has frequent jerking movements throughout the night. She has difficulty sleeping with him because of this." (Tr. 490). On examination, Plaintiff exhibited psychomotor agitation. (Tr. 490). His affect was restricted and his mood was irritable, agitated, and guarded. (Tr. 490). His mental status examination was otherwise normal. (Tr. 491). Plaintiff was assessed a GAF

of 40. (Tr. 492). His Tegretol was increased, he was prescribed Seroquel for mood instability and sleep, referred to a sleep study, and instructed to follow-up in two months. (Tr. 492). Dr. Galdieri did not review this record. (Tr. 89, 91).

On July 20, 2011, Plaintiff followed-up with Dr. Manzella. (Tr. 376). He reported headaches, depression, anxiety, and sleep disturbance, but denied tremors. (Tr. 376). On examination, Plaintiff was observed to have anxiety. (Tr. 376). Laboratory testing was ordered as a result of high risk medications, hypertension, hyperlipidemia, and fatigue. (Tr. 377).

On August 10, 2011, Muhlenberg Behavioral Health reported to the state agency that it had no medical records for Plaintiff for the period of time after March 16, 2011. (Tr. 440-42). The same day, Plaintiff follow-up with Ms. Gordy at Muhlenberg Behavioral Health. (Tr. 488).

On September 14, 2011, Plaintiff presented to Dr. Sara Cornell, Psy. D, for a consultative examination. (Tr. 456). She noted that his "affect [was] blunted and his mood [was] dysphoric...appear[ed] to have no judgment or insight into his difficulties." (Tr. 456). Plaintiff reported that:

> [He] regards his disability as related to depressive symptoms since January 2011...Robert has experienced the following depressive symptoms: sadness, lethargy, anhedonia, avolition, pessimistic thinking, feelings of worthlessness, helplessness and hopelessness, and social isolation. He has a history of suicidal ideation and intent. Robert attempted suicide about 15 years ago. He has experienced swings in mood, which have cycled between depressive symptoms and "snapping." Robert states he has experienced racing thoughts and

rapid changes in mood, at which time he has been angered. He states he has engaged in verbal and physical aggression toward others, broken items, and destroyed property when angered. Robert states he has felt he could "beat someone to a pulp." He states he has experienced symptoms of anxiety; including fear of going places, especially appointments. Robert states he has experienced panic attacks, which have occurred without apparent cause or trigger. He later states these attacks are likely related to a history of smoking….[He] states he suffers short-term and long-term memory deficits. He is forgetful and has to write reminder lists an notes, Robert's appetite is "good." At times, he eats excessively. Robert states his sleep is variable.

(Tr. 456-57). Plaintiff reported he lost his last job when he was hospitalized, "which led to his termination." (Tr. 457). His mental status examination indicated that Plaintiff had "difficulty providing examples as to the likely outcomes of his behaviors or what he would do in various imaginary situations. He cannot perform test of counting and seriation, such as counting backwards from 100 by 7s." (Tr. 457).

Dr. Cornell diagnosed Plaintiff with "bipolar one disorder, most recent episode of depressed, severe without psychotic features," anxiety disorder, not otherwise specified, personality disorder, not otherwise specified, and poly-substance dependency "by history." (Tr. 458). She assessed him to have a GAF of 45 and recommended that he continue medication management and outpatient counseling. (Tr. 458). She opined that he had marked limitations in his ability to make judgments on simple, work-related decisions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine

work setting. (Tr. 454). She opined that he had moderate limitations in his ability to understand, remember, and carry out detailed instructions and interact appropriately with co-workers and supervisors. (Tr. 454). She opined that he had slight limitations in his ability to understand, remember, and carry out simple instructions and interact with the public. (Tr. 454). She opined that Plaintiff's difficulty with socialization left him with "no support system." (Tr. 455). She based on opinions on Plaintiff's report and her "clinical assessment." (Tr. 455).

On October 3, 2011, Dr. Anthony Galdieri, PhD, reviewed a limited portion of Plaintiff's file, including Dr. Cornell's examination, and authored an opinion on Plaintiff's mental functioning. (Tr. 97). He opined that Plaintiff had moderate limitations, but retained the ability "to make simple decisions and follow short simple directions." (Tr. 97). He opined that Plaintiff's social skills and activities of daily living were "functional." (Tr. 97). He opined that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, but was able to adapt without special supervision. (Tr. 97). He explained that Plaintiff's "memory and understanding are intact" and that his "impairments would not preclude simple routine tasks." (Tr. 97). He explained that Dr. Cornell's opinion was overstated because it "relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion" and because it is "based only on a snapshot

of the individual's functioning." (Tr. 98). Dr. Galdieri reviewed only two of Plaintiff's progress notes from Muhlenberg Behavioral Health, in February and March of 2011, and relied on the erroneous response from Muhlenberg Behavior Health in August of 2011 that Plaintiff had not been seen there since March of 2011. (Tr. 89, 91).

On October 5, 2011, Plaintiff followed-up with Ms. Gordy. (Tr. 486). She noted that "he has had usual symptoms, ie facial numbness, slurred words, 'picking at everything' included showing me where he had bleeding, and intensified migraine headaches." (Tr. 486). Plaintiff was instructed to follow-up in two weeks. (Tr. 487).

On October 19, 2011, Plaintiff followed-up with Ms. Gordy. (Tr. 484). She noted that:

> Robert came for therapy with his wife, Laurie, tonight. He was having a hard time focusing and articulating his thoughts and wanted her help in this session. We used the session for DBT given the distress he is experiencing and the need for emotions regulation. Both he and his wife could testify that he has extreme racing thoughts, high anxiety, physical symptoms of slurred speech, facial movements and it is not related to alcohol. He then revealed that he has had suicidal thoughts, but stops himself due to his love of his family. We did a suicide evaluation and he could contract for safety. I gave both of them handouts on who to call if he becomes suicidal, and he did agree to call or go to the ER. I also encouraged [partial hospitalization], as well as trying to see Dr. Weston sooner than scheduled. He is upset about not finding a job, so I also gave them literature on OVR. They said they would make an appt. They also followed through from his last session and have an appt. to see attorney Judith Dexter about appealing his 2 denials of SSID. I gave him the Burns' Depression

Scale and the Burn's Anxiety Inventory to use if he has to contact a doctor or for when he sees Dr. Weston.

(Tr. 484). Plaintiff was instructed to attempt to see Dr. Weston sooner than scheduled, to call a nurse if needed other attention sooner, and to go to the emergency room if he became suicidal. (Tr. 484).

On November 9, 2011, Plaintiff followed-up with Ms. Gordy. (Tr. 482). She noted that he came with his wife "since it is still difficult for him to communicate on his own ...They did go to the ocean for a night, and said it was the one relaxing time they have had. He also is having physical symptoms of stress..." (Tr. 482).

On November 16, 2011, Plaintiff followed-up with Dr. Weston. (Tr. 479). She noted that Plaintiff's "headaches have continued" and he "continue[d] to feel irritable with mood swings between depression and feeling 'hyper.'" (Tr. 479). On examination, Plaintiff had a "flushed face" and was "somewhat guarded at times." (Tr. 479). He exhibited "[p]sychomotor agitation with leg tapping throughout the exam, mood is 'up and down,' affect is constricted and somewhat irritable. Linear thought process." (Tr. 479). She assessed Plaintiff to have a GAF of 45 and instructed him to follow-up in four weeks. (Tr. 481).

On December 13, 2011, Plaintiff followed-up with Dr. Weston. (Tr. 477). Plaintiff had improved with Tegretol but he had developed a rash. (Tr. 477). Plaintiff's Tegretol was discontinued to see if his rash improved, and Dr. Weston indicated that they would "[c]ontinue Zyprexa 5 mg at bedtime for now. We may

need to increase this dose when the patient is off Tegretol for mood stabilization." (Tr. 478). She assessed Plaintiff to have a GAF of 50 and instructed him to follow-up in six weeks. (Tr. 478).

On January 3, 2012, Plaintiff followed-up with Dr. Weston. (Tr. 474). Examination indicated Plaintiff was "slightly oddly related" with irritable mood. (Tr. 474). She assessed him to have a GAF of 45 and summarized, "[p]atient has had a relapse in his mood symptoms including irritability since discontinuing Tegretol and Zyprexa." (Tr. 475).

On March 13, 2012, Plaintiff followed-up with Dr. Weston. (Tr. 472). She assessed him to have a GAF of 45 and summarized, "[p]atient has had some improvement in mood stability since starting Tegretol. He does have occasional low mood, insomnia, and continues to have intermittent irritability with agitation." (Tr. 473). She restarted Seroquel and continued his other medications. (Tr. 473).

On April 25, 2012, Plaintiff's file was reviewed by Dr. Navjeet Singh, M.D., who prepared a medical opinion of Plaintiff's physical functional capacity. (Tr. 466). He opined that Plaintiff could perform a range of light work with some postural and visual limitations. (Tr. 463).

On June 13, 2012, Plaintiff's psychiatrist[2] authored a medical opinion that Plaintiff had no useful ability to function in handling short, simple instructions,

---

[2] The signature on this opinion is illegible, but it is from an "M.D." (Tr. 504).

maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, sustaining an ordinary routine without supervision, working with or near others without being distracted by them, making simple work-related decisions, completing a normal workday or workweek, performing at a consistent pace, accepting instructions and responding appropriately to criticism from supervisors, and responding appropriately to changes in the work setting. (Tr. 504). The opinion explains that Plaintiff "continues to have periods of mood instability and irritability with outbursts and agitation. These symptoms lead to impairment in focus and function." (Tr. 503). The opinion also explains that he "intermittent episodes of severe irritability" are "often triggered by increased stress." (Tr. 504).

On October 24, 2012, the ALJ issued the decision. (Tr. 25). At step one, the ALJ found that Plaintiff had engaged in substantial gainful activity in early 2012, without analyzing whether this work was an unsuccessful work attempt. (Tr. 16). (Tr. 14). At step two, the ALJ found that Plaintiff's bipolar disorder, personality disorder, intermittent explosive disorder, anxiety disorder, polysubstance dependence/abuse, alcohol abuse/dependence, and cocaine abuse/dependence were medically determinable and severe. (Tr. 17). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 18). The ALJ found that Plaintiff had the RFC to perform work at all exertional levels, but is limited to occasionally

climbing, balancing, and stooping, must avoid vibration, fumes, and hazards, limited to simple, routine tasks, low stress, defined as only occasional decision-making required and only occasional changes in the work setting, with no interaction with the public and only occasional interaction with co-workers. (Tr. 19-20). A step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 24). At step five, in accordance with VE testimony, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 24). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 25).

## VI.  Plaintiff Allegations of Error

### A.  Evaluation of the medical opinions

Plaintiff asserts that the ALJ erred in crediting Dr. Galdieri's opinion over Dr. Cornell's opinion. (Pl. Brief). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). Section 404.1527(c) contains a preference for treating opinions and also provides

that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.*

Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Here, the ALJ erred in relying on Dr. Galdieri's opinion because Dr. Galdieri mischaracterized the record. *See Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) ("Since the ALJ...misconstrued the evidence considered, his conclusion...must be reconsidered"). Dr. Galdieri reviewed only two of Plaintiff's progress notes from Muhlenberg Behavioral Health, in February and March of 2011, and relied on the erroneous response from Muhlenberg Behavior Health in August of 2011 that Plaintiff had not been seen there since March of 2011. (Tr.

89). The only GAF score contained in the February and March of 2011 records was a 60. (Tr. 347-58).

The records not reviewed by Dr. Galdieri showed Plaintiff continued treatment through at least June of 2012. (Tr. 472-502). He exhibited hypervigilance, psychomotor agitation, abnormal gait, tremors, restricted affect, dysphoric and irritable mood, and perseveration in his quality of thought. *Id.* His GAF scores were as low as 30 through 2011. *Id.* His GAF never exceeded 50. *Id.* Dr. Galdieri also ignored Dr. Mackin's opinion from May of 2011, where he indicated "this is a fairly complicated in multidisciplinary medication adjustment, and patient is having these episodes frequently enough that he clearly cannot work so [he] did fill out a 12 months temporary disability form starting in January 2011 and expected to cease by January 2012." (Tr. 365).

Given the errors in Dr. Galdieri's opinion and the preference for treating and examining opinions over non-examining opinions, Dr. Galdieri's opinion does not provide substantial evidence to the ALJ's RFC assessment. *See* 20 C.F.R. §404.1527(c)(1). Moreover, the Court cannot conclude that the ALJ provided a sufficient explanation to reject Dr. Cornell's opinion or the treating source opinion. As the Third Circuit explained in *Fargnoli v. Massanari*, 247 F.3d 34 (3d Cir. 2001):

> This Court has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence.

> *See Dobrowolsky v. Califano,* 606 F.2d 403, 406–07 (3d Cir.1979) ("This Court has repeatedly emphasized that the special nature of proceedings for disability benefits dictates care on the part of the agency in developing an administrative record and in explicitly weighing all evidence."). Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. *See Cotter,* 642 F.2d at 706 (listing cases remanded for ALJ's failure to provide explanation of reason for rejecting or not addressing relevant probative evidence).

*Id.* at 42. Thus, the Court recommends remand for the ALJ to properly assess the medical opinions and craft Plaintiff's RFC.

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations of error. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.,* No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011). However, the Court notes that the ALJ she did not address whether Plaintiff's return to work constitutes an unsuccessful work attempt, as required by 20 C.F.R. §404.1574(c). On remand, the Court recommends the ALJ be required to comply with these regulations and explain why his four-month work experience was not an unsuccessful work attempt. *Id.*

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1. The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2. The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: October 9, 2015                        s/Gerald B. Cohn
                                      GERALD B. COHN
                                      UNITED STATES MAGISTRATE JUDGE